UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

WILLIAM HICKS,

                                    Petitioner,

v.                                                         9:05-CV-0801
                                                           (LEK/GHL)

JAMES WALSH, Superintendent, Sullivan
Correctional Facility,

                                    Respondent.

_____

APPEARANCES:                                  OF COUNSEL:

WILLIAM HICKS, 95-A-1640
Petitioner *Pro Se*
Sullivan Correctional Facility
P.O. Box 116
Fallsburg, New York 12733-0116

HON. ANDREW M. CUOMO                          CHELSEA H. CHAFFEE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Respondent
120 Broadway
New York, New York 10271

GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION

On June 22, 2005, William Hicks ("Hicks" or "Petitioner") filed a *pro se* Petition under

28 U.S.C. § 2254 for a writ of *habeas corpus*.  Dkt. No. 1.[1]  In that Petition Hicks challenged his

January 25, 1995, conviction in Albany County Court for one count of robbery in the first degree.

On August 4, 2006, the Respondent moved to dismiss the Petition as untimely, or, alternatively,

_____

        [1]        The Petition was filed with the Court on June 27, 2005, but is dated June 22,
2005, and I will deem it to have been filed on that date. *See Noble v. Kelly*, 246 F.3d 93, 97 (2d
Cir. 2001); *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

as without merit.  Dkt. No. 8.  Petitioner submitted a response to the motion on October 2, 2006.

Dkt. No. 9.

## I.   BACKGROUND

By judgment entered on January 25, 1995, Petitioner was convicted, after a jury trial, of

one count of first-degree robbery and was sentenced, as a persistent violent felony offender, to a

term of twenty-five years to life imprisonment (T: 18 (Sentencing Proceedings)).[2]  Petitioner

appealed this conviction and, by order dated April 18, 1996, the Appellate Division unanimously

affirmed it.  *People v. Hicks*, 226 A.D.2d 938, 641 N.Y.S.2d 161 (3d Dep't 1996).  Petitioner

sought leave to appeal to the New York Court of Appeals, and on June 17, 1996, a Judge of that

Court denied the request.  *People v. Hicks*, 88 N.Y.2d 937, 647 N.Y.S.2d 170 (1996).

Petitioner filed two *pro se* motions to vacate the judgment in the trial court, pursuant to

New York Criminal Procedure Law (hereinafter "CPL") § 440.10.  The first was filed on October

17, 1994, after the verdict was entered but before Petitioner was sentenced.  *See* First Motion to

Vacate the Judgment (Exhibit G[3]).  On January 22, 1995, the trial court denied this motion

because sentence had not been imposed and the judgment had not yet been entered.  *See* Order

Denying First Motion to Vacate the Judgment (Exhibit H).  Petitioner filed a second *pro se*

motion to vacate the judgment on March 8, 2002, *see* Second Motion to Vacate the Judgment

(Exhibit I), and the District Attorney's Office submitted an affidavit in opposition.  *See* Affidavit

in Opposition to Second Motion to Vacate the Judgment (Exhibit J).  On May 8, 2002, the trial

---

[2]      "T" is the Trial Transcript, a copy of which was received by the Clerk of the Court
on August 4, 2006.

[3]      References to exhibits are those received by the Clerk of the Court on August 4,
2006.

court denied this motion. *See* Order Denying Second Motion to Vacate the Judgment (Exhibit

K). There is no indication that Petitioner sought leave to appeal this decision.

Petitioner apparently filed a petition for a writ of *habeas corpus* in the Supreme Court,

Sullivan County, on September 29, 2003.[4] Respondent submitted a letter requesting that the

court dismiss the petition for failure to properly serve Respondent, *see* Letter Seeking Dismissal

of State *Habeas* Petition (Exhibit L), and by order dated February 4, 2004, the County Court

dismissed the petition. *See* Order Dismissing State *Habeas* Petition (Exhibit M). Petitioner

moved for permission to resubmit his *habeas* petition in March 2004, *See* Motion to Resubmit

State *Habeas* Petition (Exhibit N), Respondent submitted a letter opposing this application, *see*

Letter in Opposition to Motion to Resubmit (Exhibit O), and by order dated May 10, 2004, the

County Court denied this motion. *See* Order Denying Motion to Resubmit (Exhibit P).

Petitioner apparently did not appeal this decision. Dkt. No. 1 ¶¶ 11(c), (d).

## II.     DISCUSSION

### A.     Timeliness

As noted above, the New York Court of Appeals denied Petitioner leave to appeal on

June 17, 1996. His conviction became final ninety days later, on September 16, 1996, the date

that time to seek a writ of *certiorari* from the Supreme Court on direct review expired. *Williams*

*v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001). Pursuant to 28 U.S.C. § 2244(d)(1)(A), Petitioner

had one year from that date, or until September 16, 1997, to seek *habeas corpus* relief in this

Court. The Petition was filed on June 22, 2005, and therefore is untimely, unless Petitioner is

---

[4]      Respondent advises that a copy of this petition is not available, but that the
Sullivan County Clerk's Office has informed Respondent of the date this petition was filed. Dkt.
No. 8, Ex. 1 at 2 n.2.

entitled to tolling of the limitations period.

### 1.    Statutory Tolling

Section 2244(d)(2) of Title 28 provides: "The time during which a properly filed

application for State post-conviction or other collateral review with respect to the pertinent

judgment or claim is pending shall not be counted toward any period of limitation under this

subsection."  Here, Petitioner's first motion to vacate the judgment was filed and denied before

his conviction became final on September 16, 1996, and therefore it is not a basis for tolling.

Petitioner's remaining applications for State post-conviction relief were all filed well after

September 17, 1997, the date on which his time to file a federal *habeas* petition expired (*see*

Exhibits I, L, and H).  Because these applications were not pending during the one-year

limitations period, they did not toll the time in which Petitioner could file a federal *habeas*

petition.  *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (the tolling provision of 28

U.S.C. § 2244(d)(2) "does not reset the date from which the one-year statute of limitations begins

to run"); *Thomas v. Walsh*, No. 03 CV 4662, 2005 WL 1621341, at *8 (S.D.N.Y. July 12, 2005)

("[petitioner's] post-conviction motions were never pending during the one-year grace period and

thus they may not toll the grace period").  Therefore Petitioner is not entitled to statutory tolling.

### 2.    Equitable Tolling

"Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a

case-by-case basis to prevent inequity."  *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996).

In this case District Judge Kahn observed that equitable tolling is appropriate only in

"extraordinary situations," and it is "applied infrequently and must be reserved for extreme and

unusual circumstances."  Dkt. No. 5 at 2.  In addition, the party seeking equitable tolling must

show that he "acted with reasonable diligence throughout the period he [sought] to toll." *Walker v. Jastermski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)).

### a.    The Missing Transcripts

Here Petitioner claims that the circumstance that prevented him from filing a timely Petition was

> . . . that the pretrial and trial transcripts were stolen and or illegally appropriated by another inmate, while the transcripts were in the confines of the Sullivan Correctional Facility Law Library.  The dates of which the transcripts were stolen were 1996, and the said transcripts were not recovered until the year of the submission of the 440.30, to the New York State Supreme Court, wherein the Petitioner was tried.

Dkt. No. 4 at 1; *see also*, Dkt. No. 9 at 2-3.  I will assume *arguendo* the validity of this claim, and I will assume *arguendo* that the transcripts were unavailable to Petitioner as of September 16, 1996, the date when the one year limitations period began to run.  However, Petitioner had obtained the transcripts by at least March 8, 2002, when he filed in Albany County Court a motion to vacate the judgment of conviction.  *See* Exhibit I ¶ 5, which contains a specific reference to pages 82-83 of the trial transcript.  The motion was denied on May 8, 2002 (Exhibit K), and Petitioner's time to seek leave to appeal expired on or about June 7, 2002 (CPL § 460.10).  Thus even if the period from September 16, 1996, through June 7, 2002, was tolled because of the "missing" transcripts, the one year limitations period would have run on June 7, 2003.  The Petition was not filed until over two years later, on June 22, 2005.  Dkt. No. 1.

In addition, as noted above, Petitioner "must show that he 'acted with reasonable diligence throughout the period he [sought] to toll.'"  *Walker*, 430 F.3d at 564.  Here Petitioner

has not shown, nor has he even alleged, that he did **anything** in an attempt to obtain the transcripts during the six years' period that they purportedly were missing.  Under these circumstances equitable tolling would not be warranted.

### b.      Actual Innocence

Petitioner argues that his Petition should not be dismissed as untimely because he is actually innocent.  Dkt. No. 4 ¶ 3; Dkt. No. 9 at 7.  As District Judge Kahn has observed in this case (Dkt. No. 5 at 3-4), the Second Circuit has

> instructed district courts faced with untimely petitions in which the petitioner asserts his or her actual innocence to determine, in each case, whether the petitioner has presented a credible claim of actual innocence before ruling on the legal issues of whether such a showing provides a basis for equitable tolling and whether the petitioner must also demonstrate that he or she pursued his or her claim with reasonable diligence.

*Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (citing *Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003).  In order to assess the credibility of Petitioner's claim of actual innocence, it is helpful to have some familiarity with the parties' positions at trial.  I find that the Respondent's summary of those positions, as set forth in his Memorandum of Law (Dkt. No. 8, Ex. 1 at 10-16), is generally accurate, as follows:

### The People's Case

In the early morning hours of October 7, 1993, Kenneth T. Cleary was the sole employee working at a Mobil Mart located in Colonie, New York.  At around 12:30 a.m., Petitioner entered the store, brought a bottle of Pepsi to the counter, and walked behind Cleary to look at a candy display.  No other customers were in the store at this time.  Cleary turned his attention away for a moment, then saw that Petitioner had approached him behind the counter and was holding a

knife.  Petitioner "had [Cleary] pushed up against the counter with the knife to [his] stomach" and stated "[g]ive me the money.  It's not worth getting hurt over."  Cleary opened the cash register and Petitioner removed several bills from the drawer.  Petitioner told Cleary to get down on the floor, then dragged him around to the front of the register and ran out of the store.  Cleary testified that Petitioner's "ability to move around" seemed "normal" and he did not notice that Petitioner had a limp.  Cleary then called the police, who arrived within fifteen minutes.  It was stipulated that $335 was stolen from the Mobil Mart.  (T: 33-48, 51, 57, 200.)

Patrolman David Leonardo responded to the Mobil Mart.  Based on the description of the perpetrator received from the dispatch, Leonardo began patrolling the nearby areas in an attempt to find the perpetrator.  Leonardo stopped at the Blu Bell Motel, which is located approximately four-tenths of a mile from the Mobil Mart.  Leonardo asked a man standing in front of one of the motel rooms, who did not fit the description of the perpetrator, if he had seen anyone fitting the description.  The man responded negatively.  As he was speaking to this man, Leonardo looked through the open door into the room and saw a man standing in the bathroom who "look[ed] out and then [went] back in and look[ed] out again and [came] back in."  The man Leonardo was questioning indicated that this was his room and told Leonardo that there was no one else in the room.  Leonardo asked if he could enter the room and the man consented.  Officer Robert Krug then arrived at the motel and the two officers entered the room.  Leonardo ordered the man in the bathroom to come out and Petitioner, who fit the description of the perpetrator, walked out.  Petitioner was then handcuffed and, during a pat-down for weapons, Krug recovered a knife and $200 in five and ten dollar bills from his pants pockets.  (T: 76-90, 109-17, 140-46.)

Petitioner was placed under arrest and Leonardo read him the *Miranda* warnings.

7

Petitioner indicated that he understood these rights and that he was willing to cooperate with the officers.  Leonardo observed that Petitioner did not have any problem walking form the motel to the car and testified that Petitioner did not ask for permission to retrieve his crutches from his room before leaving the motel, nor did he mention any problems with his knees or legs.  Leonardo and Krug then drove Petitioner to the Mobil Mart.  Leonardo took Petitioner out of the car and, after viewing Petitioner from the front and the side from approximately twenty or twenty-five feet away in a "very well lit" area, Cleary identified him as the robber.  Cleary identified Petitioner based on the clothing that he was wearing and his physical features.  This identification took place approximately fifteen minutes after the officers first responded to the scene of the crime.  (T: 48-50, 62-72, 90-97, 117-33, 163.)

Petitioner was taken to the Colonie Police Department and arrived around 1:00 a.m.  Investigator Andrew Zostant interviewed Petitioner and observed that Petitioner's ability to walk and move around was "normal."  Zostant confirmed that Petitioner had been given and understood the *Miranda* warnings and Petitioner agreed to speak with Zostant.  Petitioner then made an oral statement, which was reduced to writing and signed by Petitioner.  Petitioner's written statement was read into the record.  Petitioner stated, in relevant part:

> I went to the Mobil Mart on the corner of Central Avenue and Route 155 to get a soda.  After I got inside the mart I went to the cooler and grabbed a Pepsi.  After looking around I noticed that the clerk was the only person in the store and he looked timid and I thought that this would be an easy robbery, that nobody would get hurt.  So I ran around the counter with my knife in my hand and told him to open the cash register, and that if he did what I told him to do, he wouldn't get hurt.  The clerk opened the register and when he did I reached in and grabbed the money and then ran out of the store.  I ran back to the motel and when I got to the front of the motel, I noticed that the police were close.  So instead of running

8

> to my room that was further towards the back, I ran into this other
> person's room that was closer to Central Avenue.  I asked this guy
> if I could use his bathroom.  I think that the police saw me go into
> this room and they yelled to me to come out of the bathroom and to
> lay down on the bed.  Afterwards the police found the money that I
> took in my pants pocket, as well as the knife that I used.

Petitioner also told Zostant that he had smoked crack cocaine earlier that night.  (T: 96, 132, 170-88.)

### Petitioner's Case

Petitioner testified in his own defense.[5]  In September 1993, Petitioner was attacked and beaten with baseball bats and spent approximately one week in Albany Medical Center being treated for fractures in his legs and back pain.  Upon being discharged on September 14, 1993, Petitioner was instructed to stay off his legs for six to eight weeks and went to stay at the Blu Bell Motel.  During the next several weeks, Petitioner "always" used crutches and would sometimes take off his leg immobilizers to try to exercise his legs.  On October 6, 1993, Petitioner was still using the immobilizers and crutches.  On that day, Petitioner drank vodka and beer "all day" with a neighbor and around 10:00 p.m., Petitioner went to another room and smoked crack cocaine with two other people.  (T: 251-55.)

Around 11:00 p.m., Petitioner and his friends "ran out of the drugs that we were smoking" and Petitioner went to another room to buy drugs from a man named Isaiah.  Isaiah informed Petitioner that he had run out of drugs but would send his roommate to get more.  The

---

[5]    Prior to Petitioner's testimony, his attorney requested that the Court advise Petitioner that he was not required to testify and stated that he had "reservations" about Petitioner testifying.  The Court advised Petitioner that, should he decide not to testify, the Court would instruct the jury, upon his attorney's request, that they could draw no adverse inference from the failure to testify.  Petitioner indicated that he understood and still wished to testify (T: 248-49).

roommate, whose name Petitioner did not know, borrowed Petitioner's coat and left to get more drugs.  After thirty or forty-five minutes, the roommate came back and "seemed out of breath." He returned Petitioner's coat and went to another motel room.  At this point, Isaiah was standing in the open doorway of his room.  Petitioner put his coat on and went to use the bathroom in Isaiah's room while leaving the bathroom door open.  While he was in the bathroom, he heard voices and turned around and saw a police officer in the doorway talking to Isaiah.  The officer then entered the room and told Petitioner to come out of the bathroom.  Petitioner did so and was handcuffed and frisked.  The officers then attempted to take Petitioner out of the motel room and he informed them that his legs had been broken and he needed to get his leg immobilizers and crutches.  Petitioner was not wearing the immobilizers at this time.  Leonardo told him that he would not need these items in jail and that if he did, some would be provided for him.  (T: 255-60, 290.)

As he took Petitioner form the motel room, Leonardo read him his rights off of a card, but Petitioner stated that he "didn't, you know, pay too much attention to it," although he admitted being familiar with these rights from previous arrests.  Petitioner testified that he remembered telling the officers that he would cooperate.  Leonardo then put Petitioner in the back seat of the police car and drove him to the Mobil Mart.  Upon arriving, Leonardo took Petitioner out of the car and Petitioner saw the store clerk stand inside the door to the entrance of the store while Leonardo told him to turn around.  Petitioner testified that he was "pretty far" from the store during this time because he "couldn't see who the guy was that was identifying me."  The officers then took Petitioner to the police station.  (T: 260-64, 268-69, 293-97.)

Upon arriving at the police station, Petitioner was placed in a holding pen and fell asleep

on a bench for what "seemed like a long time."  An officer woke him up and took him into

another room.  At this time, Petitioner was "still half asleep" and "didn't care what was going on"

because "he just wanted to sleep."  Petitioner testified that he remembered speaking to an officer

and telling him information about his past and his "personal life."  The officer "did a lot of

writing on the paper," then asked Petitioner to sit near him in front of a computer.  Petitioner

could not see the computer screen and did not remember the officer handing him any pieces of

paper while they were at the computer.  They then went back to the officer's desk and the officer

handed him a typed piece of paper.  Petitioner read the first two lines of the paper but then did

not read the rest of it because he was tired and "[t]he only thing I was thinking about was going

back to my bullpen and sleeping."  Petitioner just read the first two lines then said "O.K." and

handed the paper back to the officer.  Petitioner testified that he did not "really" read the

statement and "wasn't interested in what it said" because "the only thing on my mind was getting

back to sleep and getting everything over."  Petitioner admitted to signing this statement but

stated that he did not make the inculpatory statements regarding the robbery.  (T: 264-70, 276,

304-11.)

Defense counsel introduced into evidence Petitioner's medical records form the Albany

Medical Center (T: 244-45).  Patricia Castelano, the manager of the Blu Bell Motel in the fall of

1993, testified that she was familiar with Petitioner and saw him nearly every day at the motel.

Castelano stated that Petitioner wore leg immobilizers on both legs and used crutches to walk,

although "on occasion" Petitioner would walk without the crutches "to build up some strength in

his legs."  Castelano saw Petitioner within two days of the robbery using the immobilizers and

crutches.  (T: 234-38.)

In *Doe v. Menefee*, the Second Circuit instructed that the type of evidence on which an actual innocence claim may be based must meet a "demanding standard." "The petitioner must support his claim 'with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Doe v. Menefee*, 391 F.3d at 161 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  The Petitioner here does not come close to meeting this "demanding standard."

Petitioner's claim of actual innocence is based upon his contention that he could not possibly have been the perpetrator on October 7, 1993, because at that time he suffered from injuries that precluded him from perambulating as the perpetrator did.  Dkt. No. 4 ¶ 3; Dkt. No. 9 ¶ 4 & at 8-9.  However, there is nothing "new" about this contention, and it **was** "presented at trial."  Indeed, it was a central aspect of Petitioner's trial counsel's summation.  (T: 326-329.) Similarly, as Petitioner acknowledges, the Albany Medical Center records were received in evidence and presented to the jury.  Petitioner states in his Petition: "The defense counselor at trial of the petitioner, had the court subpoena the medical records but this medical information was never interpreted for the trial jury and or the court in order for them to realize the petitioner could not have run at all."  Dkt. No. 1 at 8.  Similarly,

> Petitioner's trial court judge and the defense counselor, did cause the trial jury to look at the medical reports within the deliberation room and in the courtroom, however, the defense counselor nor the trial judge appointed anyone as an expert to explain away the diagnostic explainations [sic] of which the Medical X-Ray Reports presented as a fact, of which would have clearly shown that the herein Petitioner, simply could not have ran, or even walked from the vicinity of the store wherein the robbery had occurred.

Dkt. No. 1 at 9.

In sum, Petitioner's claim in this proceeding is not supported with "new" evidence, and the evidence proffered here was presented at his 1995 trial.  Therefore, he has not presented a "credible claim of actual innocence" (*Doe v. Menefee*, 391 F.3d at 161), and equitable tolling is not warranted.

     **ACCORDINGLY**, it is hereby

     **RECOMMENDED**, that the motion to dismiss (Dkt. No. 8) be **GRANTED**; and it is further

     **RECOMMENDED**, that the Petition (Dkt. No. 1) be **DENIED** and **DISMISSED** as untimely.[6]

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: March 29, 2007
       Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

     [6]     Given this recommendation, I have not considered Respondent's alternative request that the Petition be denied as without merit.

13